

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 12, 2025

**BY ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    <u>United States v. Gerald Shaw</u>, 25 Cr. 158 (JGK)

Dear Judge Koeltl:

    The Government respectfully submits this letter in advance of sentencing in this matter for defendant Gerald Shaw (the "defendant"), which is presently scheduled for November 19, 2025. On April 10, 2025, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") to one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 371, in connection with an advance-fee fraud scheme related to a fictitious bank known as "Dominion." The Government respectfully recommends that the Court impose a below-Guidelines sentence consistent with the recommendation of the Probation Office ("Probation"), as further detailed below.

    **I.**    **Overview**

    A.  <u>The Offense Conduct</u>

    This case arises out of the activities of Dominion Bank and its affiliated entities (collectively, "Dominion"). (PSR ¶ 7). From its formation in approximately 2015 until at least July of 2020, Dominion held itself out as a purported financial institution that could extend and facilitate financing for small businesses, including via standby letters of credit, in exchange for a fee. (PSR ¶ 7). In reality, however, Dominion was not a functioning financial institution and it could not provide legitimate financing services—the supposed standby letters of credit customers received were worthless. (PSR ¶ 7). In total, Dominion defrauded approximately 60 victims out of approximately $4 million.

    1.  Standby Letters of Credit

    A standby letter of credit ("SBLC") is a contract between a bank and its client. SBLCs are usually used by businesses seeking to obtain contracts for goods or services. (PSR ¶12). An SBLC typically does two things. First, the bank that issues the SBLC effectively vouches for the creditworthiness of its client. (PSR ¶ 12). This voucher provides legitimacy to a client's claims

that it can satisfy financial obligations and is the "letter of credit" portion of an SBLC. (PSR ¶ 12). Second, the issuing bank becomes the client's guarantor, promising that if the client cannot meet its financial obligations, the bank will make payment on the client's behalf. (PSR ¶ 12). This is the "standby" portion of the SBLC, as the bank is on standby as a guarantor. (PSR ¶ 12). The client pays the bank to issue an SBLC, the cost for which is typically a percentage of the total obligation that the bank has agreed to guarantee. (PSR ¶12).

2. Dominion's Fraud Generally

The lies Dominion told to its customers as part of the scheme were myriad. Although Dominion's website held Dominion out as a registered statutory trust under the Investment Company Act, Dominion was never registered as such with the Securities and Exchange Commission ("SEC"). (PSR ¶ 13). Similarly, the Dominion website claimed that Dominion was registered in Mwali and Gambia. However, for at least part of the scheme, its Mwali license was not active. Additionally, although Dominion's website claimed Dominion had an office on State Street in Manhattan's financial district, that office was merely a virtual office shared by numerous companies. (PSR ¶ 13).

With respect to Dominion's assets, Dominion officers claimed that Dominion had billions of dollars in assets. In reality, Dominion generally held tens of thousands of dollars in its bank accounts and only infrequently held more than one million dollars. (PSR ¶ 13). That overall financial portrait was dramatically different from what Dominion Bank claimed, and far too small for Dominion to have guaranteed the SBLCs it issued. (PSR ¶ 13). Moreover, when Dominion received payments, largely equivalent funds were typically quickly transferred out of Dominion's bank accounts, often to non-Dominion accounts controlled by Dominion's officers or their relatives or associates. (PSR ¶ 13).

In terms of functionality, Dominion did not maintain bank accounts at Dominion itself. Rather, Dominion opened and used bank accounts at other legitimate banks to attempt to operate Dominion. (PSR ¶ 13). Similarly, despite representations to its customers to the contrary, Dominion did not have the ability to utilize the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") system, a network that enables financial institutions worldwide to communicate securely about financial transactions. (PSR ¶¶ 13, 42). Instead, Dominion had to ask banks, known as "relay banks," to relay its SWIFT messages. (PSR ¶ 13).

The Dominion advance-fee scheme generally worked as follows. Customers approached Dominion about obtaining credit instruments. A Dominion officer would explain Dominion's offerings to the customer. During the course of that explanation, the officer would inform the potential customer, among other things, that Dominion had billions of dollars in assets, was subject to United States banking regulations, and had access to the SWIFT system to transfer funds. (PSR ¶ 15, 24). Customers were also told that Dominion could open an account for the customer, and the funds would be administratively blocked so that the customer could not withdraw the funds, but Dominion could issue SBLCs based on funds in the account. (PSR ¶ 15). For its services, Dominion charged a "relationship fee," typically in the range of tens of thousands of dollars, as well as a fee of approximately one percent for any financial instrument. (PSR ¶ 16). Dominion did not deny customer applications for SBLCs, despite the fact that the purpose of an

SBLC is to guarantee a customer's creditworthiness and, therefore, should have required customers to pass a rigorous due diligence process. (PSR ¶ 13). After receiving an SBLC, Dominion's customers attempted to pass them to execute business transactions. Customers quickly found, however, that they were unable to use any SBLCs issued by Dominion. As one victim has explained, a potential counterparty described Dominion's SBLC as a "worthless piece of paper." Another victim has stated that a potential counterparty described a $4 million Dominion SBLC as not "worth the paper it's printed on." (PSR ¶ 13). Those victims paid tens of thousands of dollars to Dominion for those SBLCs. When Dominion's customers attempted to obtain their money back, Dominion refused. (PSR ¶ 21, 28, 34).

   3. The Defendant's Role

From approximately October 2016 until April 2020, the defendant was employed by Dominion in a compliance role, including as Chief Compliance Officer, despite the fact that he had previously been convicted of investment fraud and been disbarred as an attorney. (PSR ¶¶ 10, 37). In that role, the defendant's responsibilities primarily involved drafting documents, including SBLCs. (PSR ¶ 10). The defendant drafted those documents despite his awareness that Dominion was selling worthless financial instruments and lacked the assets and ability to back-up its representations. (PSR ¶ 11).

In connection with executing the scheme, the defendant sent SBLC applications to potential customers, approved SBLC applications, invoiced customers for SBLC "issuance" fees, and communicated with customers regarding certain requested transactions. (PSR ¶¶ 10, 32, 37). For example, on December 28, 2018, the defendant sent a text message to an officer of Dominion saying that a customer had called the defendant "saying a transaction . . . was rejected by the receiving bank because Dominion's license had lapsed. I knew the answer but I told her I would find out. What do you want me to tell her? Call me." (PSR ¶ 21). Similarly, when a customer emailed the defendant to request "a profile of [Dominion] or some other verification of dominion['s] financial strength to perform or their financial rating in the business world" to present to another bank so that the bank would accept Dominion's SBLC, the defendant responded, "Please be advised that Dominion Bank is a private regulated institution; as such, our audited financial statements are on file with our licensing regulators and not for public consumption. If you need more than our License registration, please have the 'financial institution' you refer to in your email contact me directly. I would be happy to assist them with any information they need on a 'bank to bank' basis." (PSR ¶ 33).

The defendant was also involved in Dominion's refusal to return customer money once customers realized the SBLCs issued by Dominion were worthless. For example, after one victim ("Victim-3" in the PSR) realized that counterparties would not accept a Dominion SBLC, Victim-3 asked Dominion to return its $25,000 deposit. (PSR ¶ 27). The defendant, however, informed Victim-3 that the deposit was a fee for performing services such as removing administrative holds, depositing funds, and issuing SWIFT messages. In addition, the defendant wrote that "After several discussions with our UK and Treasury regulators, this matter is now closed."

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The $25,000 deposit was not returned.

For his work at Dominion, the defendant received a salary of $500 per week. (PSR ¶ 44). In total, over the course of the scheme, the defendant received $43,135 from Dominion. Many of those payments were made to the defendant shortly after customer funds were transmitted to Dominion. (PSR ¶¶ 22, 29, 32).

B. Procedural History

The defendant arrested on April 20, 2023 on a complaint. On April 10, 2025, the defendant waived indictment and pled guilty pursuant to a plea agreement (the "Plea Agreement") to a one-count information (the "Information") charging him with conspiracy, in violation of Title 18, United States Code, Section 371. (PSR ¶ 3).

In the Plea Agreement, the parties stipulated to a United States Sentencing Guidelines (the "Guidelines") range of 51 to 60 months' imprisonment (the "Guidelines Range"), based on an offense level of 23 and a criminal history category of II.[1] (PSR ¶ 3). The United States Probation Office agrees with that calculation. (PSR ¶¶ 64, 68, 109).

This case does not represent the defendant's first brush with the law. In July of 2010, the defendant plead guilty to wire fraud, in violation of 18 U.S.C. § 1343, in United States District Court for the Central District of California in connection with his role in a high-yield investment fraud scheme. (PSR ¶ 66). The defendant was sentenced to 70 months' imprisonment and ordered to pay more than $4 million in restitution. (PSR ¶ 66). The defendant was on supervised release for that offense at the time he engaged in this offense. (See PSR ¶ 66).

II. **Discussion**

A. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596.

After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification

---

[1] Were it not for the statutory maximum term of incarceration that may be imposed under 18 U.S.C. § 371, the defendant's Guidelines range would be 51 to 63 months' imprisonment.

is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

B. The Court Should Impose a Below Guidelines Sentence Consistent with Probation's Recommendation

Consistent with the recommendation of Probation, the Government believes that in light of the defendant's age and health concerns, a below-Guidelines sentence is appropriate in this case. The Government does not, however, believe that a non-incarceratory sentence, as the defendant requests, would be sufficient to meet the goals of sentencing. Instead, the Government believes that a sentence consistent with Probation's recommendation of 40 months' imprisonment would be appropriate, particularly in light of the seriousness of the offense and the need to deter criminal conduct and promote respect for the law.

As an initial matter, this offense was serious. The scheme resulted in roughly 60 people losing approximately $4 million. Those losses were incurred over years and resulted from repeated and egregious misrepresentations to Dominion's customers. These were neither one-time misstatements nor statements that fell into a grey area of truth or falsity. Dominion held itself out as a bank—an institution in which customers are supposed to be able to place trust—when in reality it was incapable of operating as one. Dominion did not have the ability to receive deposits into its own accounts, it held almost no assets, it did not have appropriate licenses and registrations, it was not appropriately audited, and the credit documents it issued were worthless. In short, Dominion was a sham institution, designed to misappropriate funds from unsuspecting customers.

Although the defendant did not found Dominion, was not a leader, and did not profit as much as other Dominion officers, the defendant was fully aware of what he was doing—helping to perpetrate a brazen fraud on Dominion's customers. The defendant is a sophisticated actor. He has a college degree, a law degree, and worked as a practicing lawyer for over 30 years. (PSR ¶¶ 90, 92, 100). Although the defense portrays the defendant as someone who took a job at Dominion only because it was all that he could find with a felony conviction, and who was surprised to learn that Dominion was engaged in fraudulent conduct, the reality is somewhat more nuanced. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The defendant, however, had had previous contact with CC-1 through the scheme that resulted in his prior federal conviction and sentence to 70 months' imprisonment. (PSR ¶ 101 & n.4).[2] Indeed, the defendant has stated he was a 50 percent owner in CC-1's business, a trading company

---

[2] The actual name of CC-1 is listed in footnote four to paragraph 101 in the PSR.

through which no legitimate business was conducted. (PSR ¶ 101 & n.4). Given the defendant's prior association with CC-1, it is hard to believe that he was completely surprised to learn that Dominion was part of a fraudulent scheme.

Additionally, although it is true that the defendant's primary role at Dominion was creating documentation and paperwork, he was not entirely a "back office" worker, as the defense describes. (Dkt. 65 at 2, 7, 24). He was in occasional contact with Dominion's customers—sending them SBLC applications, approving applications, sending them invoices, and responding to their questions both over email and the phone. (PSR ¶ 17, 19, 20, 21, 27, 28). Moreover, that he was held out as Dominion's Chief Compliance Officer was likely meant to put customers at ease—their money was safe because Dominion had a compliance department.



In sum, this case involves serious and brazen conduct that resulted in substantial losses to scores of victims. The defendant engaged in the conduct directly on the heels of his release from prison on a prior fraud conviction. In order to recognize the seriousness of the offense, promote respect for the law, and deter future criminal conduct both by this defendant and other would-be fraudsters, the Government believes a period of incarceration in line with Probation's recommendation is appropriate.

**III.    Conclusion**

  For the reasons set forth above, the Government respectfully submits that a below-Guidelines sentence in line with Probation's recommendation of 40 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

         Respectfully submitted,

         JAY CLAYTON
         United States Attorney for the
         Southern District of New York

       by:  /s/
         Maggie Lynaugh
         Assistant United States Attorney
         (212) 637-2448

cc: Defense Counsel (by ECF)